CALOGERO, Chief Justice.*
The Louisiana Public Service Commission granted a contract carrier permit to A. Roussell Truck Service over the protests of two common carriers who then appealed the grant of authority to the Nineteenth Judicial District Court for the Parish of East Baton Rouge. The district court affirmed, and the protestants appealed to this court. For reasons which follow, we conclude that the district court was correct. Accordingly, we affirm that judgment.
A. Roussell Truck Service, Inc., applied to the Louisiana Public Service Commission for a contract carrier permit authorizing the transportation of molasses for two named shippers, Caldwell Sugars Co-op, Inc. and St. Martin Sugar Co-op, Inc., and three unnamed shippers, over irregular routes in six parishes, St. James, St. John the Baptist, LaFourche, St. Martin, St. Mary, and Iberia. Roussell’s application was heard by an examiner on May 2, 1989, and was protested by two common carriers with statewide authority for hauling various commodities including molasses. The Commission found that the grant to Rous-sell was in the public interest and approved the permit. Louisiana Public Service Commission Order No. T-18266, June 7, 1989. The two protestants with common carrier certificates, Dupre’ Transport, Inc. and Ray White Trucking, Inc., sought a rehearing and/or reconsideration from the Commission. It was denied. Louisiana Public Service Commission Order No. T-18266-A, July 13, 1989. Then they appealed the Commission’s ruling to the district court. The district court affirmed the Commission’s grant of authority, finding that the Commission had a reasonable basis to support its finding that issuance of a contract carrier permit was in the public interest. Dupre’ and White thereupon appealed to this court. La. Const, art. IV, § 21(E).
In CTS Enterprises, Inc. v. Louisiana Public Service Commission, 540 So.2d 275 (La.1989), we discussed at length the similarities and differences between the Commission’s authority in granting contract carrier permits and common carrier certificates. A contract carrier transports passengers or property under special contract, whereas a common carrier is available to the general public. La.R.S. 45:162(4), (5); CTS, 540 So.2d at 278. Before the Commission may issue a contract carrier permit, it must determine that the issuance is in the public interest, whereas before granting a common carrier certificate, the Commission must find that public convenience and necessity require the issuance of a certificate. La.R.S. 45:164; CTS, 540 So.2d at 279. In CTS, we concluded that the Commission, when determining whether a contract carrier permit is in the public interest, should consider the same factors that it considers before issuing a common carrier certificate of public convenience and necessity, except that it should give those factors less exacting scrutiny because the contract carrier authority is more limited in nature and thus less likely to upset the equilibrium of the marketplace. 540 So.2d at 283. See also Dupre’ Transport, Inc. v. Louisiana Public Service Commission, 556 So.2d 588, 591 (La.1990). Those factors include: the number of shippers to be served by the applicant, the nature of the service proposed, the effect which granting the permit would have upon the services of the protesting carriers, the effect which denying the permit would have upon the applicant and its shippers, and the changing character of the shippers’ requirements. Dupre’, 556 So.2d at 591; CTS, 540 So.2d at 283. On judicial review a court will not upset the Commission’s determination unless it is based on an error of law or is one which the Commission could not reasonably have found from the evidence. Dupre’, 556 So.2d at 591; CTS, 540 So.2d at 278.
*912 At the hearing before the examiner Alvin Roussell, owner of A. Roussell Truck Service, presented his own testimony and that of two other witnesses in support of his application for a contract carrier permit. Roussell testified that he is the owner of A. Roussell Truck Service which he is planning to incorporate pending the decision of the Commission. He currently operates two tractor trailer units with tank trailers of 5,000 gallon capacity used only for molasses. Roussell testified that his trailers are approved by the Department of Transportation and regularly maintained. He himself owns a repair and supply service for automobiles and trucks. He has operated his trucks since 1973 without accident. Roussell explained that he has leased his trucks to Caldwell Sugars Co-op since October 1988 on a five year lease arrangement. He has also leased his trucks to St. Martin Co-op for hauling molasses periodically, based on an individual contract each time. Roussell stated that he seeks a contract carrier permit to transport molasses for these two named shippers with whom he has been doing business on a lease basis as well as three unnamed shippers consisting of other sugar mills in the same area who are interested in his service.
Roussell’s two supporting witnesses were A.J. LeBourgeois, Jr. and Kenneth Peltier. LeBourgeois, Chief Accounting Officer, Secretary, and Treasurer of Louisiana Sugar Cane Products, Inc. in Baldwin, Louisiana testified that his organization is a marketing cooperative comprised of six sugar cooperatives: Breaux Bridge Sugar Cooperative, Inc., Cajun Sugar Co-op, Inc., Caldwell Sugar Co-op, Inc., St. James Sugar Co-op, Inc., St. Martin Sugar Co-op, Inc., and St. Mary Sugar Co-op, Inc. Among other responsibilities, LeBourgeois arranges for barges and rail cars on which molasses is loaded, although he does not personally arrange for trucking, which is handled through the individual co-ops.
According to LeBourgeois, LSCP was formed to market Louisiana grown sugar cane and molasses from the six local cooperatives. LeBourgeois explained that Westway Corporation, a world-wide purchaser of molasses, had previously bought their molasses and mingled it with other molasses products such as beet molasses from the United States as well as molasses from other countries. LSCP sought competitive pricing for their molasses but was unsuccessful in getting such prices from Cargill, another of the world’s largest molasses buyers. Thereafter, the co-ops sought out a U.S. market for their product and were successful in putting together a package requiring them to produce and deliver to a U.S. buyer pure, unadulterated Louisiana black strap molasses. In furtherance of their marketing strategy, LSCP invested over a million dollars, including $250 thousand in storage and shipping facilities. LeBourgeois testified that the success of the new marketing program, still in its first year of existence, in competing against industry giants such as West-way and Cargill and against foreign molasses producers, depended on LSCP being independent from their competitors in terms of shipping patterns and storage and on their ability to keep their product unadulterated and free from contaminants. In conjunction with these requirements, Le-Bourgeois noted that Roussell did not haul for the giants, thus assuring LSCP confidentiality in their shipping arrangements, and, since Roussell only transported their product, they were assured of their product remaining unadulterated. In these respects LeBourgeois entreated the Commission to grant Roussell the requested permit.
The next witness in support of Roussell was Kenneth Peltier, General Manager of Caldwell Sugars Co-op in Thibodeaux, Louisiana. Peltier explained that Caldwell Sugars had done business with Roussell for fifteen years hauling sugar cane. Caldwell, since entering an agreement with Quality Liquid Feed which requires Caldwell to handle its own molasses, has also leased equipment from Roussell in the past year for hauling molasses. Peltier also stated that having a trucker closer to Caldwell and the St. James terminal and storage tank thirty miles away where their molasses is loaded onto barges, would be beneficial because the shipping of molasses *913 is irregular, requiring around the clock hauling when barges are in port.
On cross examination Peltier agreed that for the fifteen years that he has been with Caldwell, prior to their recent contract with Quality Liquid Feed, Ray White had handled their molasses. Peltier complained that in the previous year one of White’s drivers had wrecked a truck and spilled molasses over the road. He also explained that White was hired by Westway which was buying their molasses at the time. Now that Caldwell’s agreement with Quality requires them to handle their own molasses, they have leased Roussell’s trucks.
Two protestants, White and Dupre’ testified in opposition to Roussell’s permit application. Ray White, owner of Ray White Trucking, which holds a common carrier certificate for hauling molasses, flour, salt, asphalt, and asphalt products, testified that he has six units of equipment capable of handling molasses and that the tanks only haul pure blackstrap molasses. White testified that he had provided service shipping molasses from Caldwell to Westway Trading Corporation for twenty-six years. However he was strictly hauling for West-way who hired him and has not hauled any molasses from Caldwell since Caldwell entered its new contract with Quality. He further testified that the revenue he derived from transporting the molasses to Westway was important to his company and that he has idle equipment at present. He admitted that he had never hauled for other members of the marketing co-operative. While his equipment is stationed in Donaldsonville, some 30 miles away, he was never requested to station trucks closer and was always able to meet the barge demands. White testified that he opposed Roussell’s application because he is able to handle the molasses, and because he does not believe that another carrier is needed. In short, he is ready, willing, and able to provide the service.
On cross examination White admitted that he had never actually worked for Caldwell but instead had hauled Caldwell’s molasses when hired by Westway. He admitted that one of his trucks had turned over the year before when driven by an inexperienced driver, and also that his equipment was not entirely idle. His trucks haul other commodities, and his molasses trailers are not “sitting there with weeds growing on them,” but, on the other hand, are not as productive as they were when Westway was purchasing molasses from Caldwell. He also admitted that in the six parishes in which Roussell was seeking a permit, his company only hauled in one, Lafourche, on a regular basis, that being when employed by Westway and Cargill to haul molasses from the Lafourche Co-op.
John R. Dupre’, Governmental Affairs Representative for Dupre’ Transport, Inc., also appeared in opposition to Roussell’s application. He testified that Dupre’ had four full terminals in Louisiana as well as four full terminals in Arkansas, and six other locations where equipment is stored in Louisiana, Arkansas, and Mississippi. Dupre’ owns eight food grade trailers, six of which can be used to transport molasses. When shippers require it, Dupre’ can dedicate equipment for a specific service. Were Dupre’ to haul for Caldwell, it would transport from the Chalmette, Louisiana terminal, about a three hour drive round trip, but would be willing to locate equipment closer during peak periods. Dupre’ testified that some of his food grade equipment was presently idle, and that he could use more business. He opposed Roussell’s application because he believes that he has the equipment available and that there is no need for the granting of additional authority. Although his equipment is not idle, it is not being used to its full capacity. However, Dupre’ has not lost business as a result of Roussell’s arrangement with Caldwell because Dupre’ never did haul for Caldwell.
The district court concluded, after weighing the requisite factors for granting a contract carrier permit, that the Commission had a reasonable basis for its decision to grant Roussell a contract carrier permit. The first factors to consider are the number of shippers, the nature of the service proposed, and the effect which granting the permit would have upon the protesting carriers. Roussell’s application is for two *914 named and three unnamed shippers, and limited to only six parishes. Protestant carriers admitted that the two named shippers had not been their customers, nor did they have molasses shippers in any of the other parishes which Roussell seeks to serve. Also, because Roussell has limited his application to a single product, molasses, and to only six parishes, the effect of his service on other carriers is minimal.
As to the fourth factor, the effect of denial of the permit on the applicant and its shippers, both Peltier and LeBourgeois testified that without Roussell’s permit, the co-ops would have to continue leasing Roussell’s trucks while hiring their own drivers and making other administrative arrangements. LeBourgeois testified extensively as to the changing character of the shippers’ requirements. These sugar cooperatives have expended considerable energy and money to develop more satisfactory and lucrative markets for their Louisiana product. Their new markets require a shipper who is in close proximity and available to ship on call, a shipper who can transport their molasses without contaminating it with other products or other molasses, and a carrier who is unconnected to the molasses “giants” so that the co-ops’ shipping patterns remain confidential. Even if White, who hauls for Westway, a competitor of LSPC members, did not breach a confidentiality regarding shipping, Westway could still get inclinations of the co-ops’ movement simply by the availability of its trucks.
After reviewing the evidence we conclude, as did the district court, that the Commission could reasonably have determined that granting a contract carrier permit to A. Roussell Truck Service was in the public interest.
DECREE
For the foregoing reasons, the judgment of the district court affirming the Louisiana Public Service Commission’s order granting a contract carrier permit is affirmed.
DISTRICT COURT JUDGMENT AFFIRMED.

 Judge Melvin A. Shortess of the Court of Appeal, First Circuit, participated in this decision as Associate Justice Pro Tempore.